IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOSEPH EDWARD J.,**[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 18-cv-296-CJP[2] |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) Benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in September 2014, alleging disability as of September 15, 2005. After holding an evidentiary hearing, ALJ Jason R. Yoder denied the application on May 12, 2017. (Tr. 26-34). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Doc. 19.

Page **1** of **14**

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. Did the ALJ err when he found plaintiff had the residual functional capacity to use his bilateral upper extremities for feeling, handling, fingering, pushing, pulling, and operating hand controls?

2. Did the ALJ err when his residual functional capacity determination failed to account for plaintiff's fatigue and daytime somnolence?

3. Did the ALJ err in concluding that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record?

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th

Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of

the ALJ. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## **The Decision of the ALJ**

ALJ Yoder followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. He found that plaintiff had severe impairments of sleep apnea, obesity, diabetes, carpal tunnel syndrome, degenerative disc disease, minimal left ulnar neuropathy, and bilateral knee pain.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level, limited to occasional use of the lower extremities for foot controls, pushing, and pulling; occasional climbing of ladders, ropes, scaffolding, ramps and stairs; frequent stooping; occasional kneeling, crouching, and crawling; frequent use of the bilateral upper extremities for feeling, handling, fingering, pushing, pulling, and operating hand controls; and no concentrated exposure to vibration and to hazards such as unprotected heights or machinery.

Based on the testimony of a vocational expert, the ALJ concluded that plaintiff could not do his past work, but he was not disabled because he was able to do other jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1979 and was almost 26 years old on the alleged date of onset. (Tr. 184). He had worked as a loader in a warehouse, a truck driver, and a cashier/janitor in a gas station. (Tr. 188).

In December 2014, plaintiff reported that he could not work because of severe back pain, exhaustion, trouble thinking, uncontrolled blood sugars, knee pain, and "hands bother me." On most days, he browsed online off and on and watched TV. Some days, he went to town to buy groceries. Sleep apnea left him "exhausted all the time." He mowed the lawn using a riding mower for 20 minutes at a time, and changed the cat litterbox. He cooked only quick and easy meals. He tried not to lift more than 15 to 30 pounds. He alleged difficulty with lifting, bending, standing, walking, and using his hands, but not with sitting, kneeling, reaching, or climbing stairs. (Tr. 204-209).

In July 2015, he reported that Kimberly Bellangee had prescribed wrist braces for his carpal tunnel syndrome in May 2015. (Tr. 219).

2. **Evidentiary Hearing**

Plaintiff was represented by an attorney at the evidentiary hearing in

February 2017. (Tr. 41).

Plaintiff weighed about 295 pounds. He had lost about 30 pounds. He was about 5'9" tall. He lived with his mother. She did his laundry. There was "not really" a reason why he could not do it. He vacuumed. (Tr. 51-53).

Plaintiff testified that he had a hard time getting to sleep and he slept lightly. If he tried to sleep without his sleep apnea machine, he woke up gasping for air. He used a BiPAP machine. With the BiPAP, he could usually sleep, but he still had a tendency to wake up. He went to bed between 1:00 and 3:00 a.m. and tried to get up at noon or 1:00 p.m. He was "definitely not a morning person at all." Once or twice a week he was so tired during the day that he had to lie down for 4 to 6 hours. Sometimes he fell asleep while watching TV. (Tr. 54-56).

Plaintiff testified that he had carpal tunnel surgery but his hands were "very, very weak." A few days earlier, he lifted a cinderblock to help his neighbor. It weighed 25 pounds, and it took him "both hands to even move that" and he had pain in in his left hand while lifting it. (Tr. 59). He had seen the surgeon for follow-up in January, and he was released from care because the doctor thought the scarring looked normal. (Tr. 62). His hands had bothered him even back when he was working, but he did not get treatment then because he had "never been one to run to a doctor." (Tr. 69).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could not do plaintiff's past work, but he could do other jobs at the light

exertional level. He also identified jobs that plaintiff could do at the sedentary level. (Tr. 81-85).

### 3. Medical Records

A sleep study was done in April 2014 because of excessive daytime sleepiness and snoring. His medical history included overweight, obstructive sleep apnea, diabetes, and hypertension. He had been using a CPAP machine. He was switched to a BiPAP machine. (Tr. 253-255).

Plaintiff received primary health care from APRN Kimberly Bellangee. She saw him in July 2014 to follow up on the sleep study. He reported that he was "doing great" and had more energy in the mornings. He had no concerns. (Tr. 333). In September 2014, his back pain was much better with a home exercise regimen. On exam, he had no back deformity or tenderness, and normal range of motion of all joints. He was "still struggling" with the diet and said that portion control was difficult. He weighed 306 pounds. His blood sugars were uncontrolled, and she indicated that if he did not watch his diet better, he would need to be on insulin. APRN Bellangee stressed that "most of his chronic conditions would be resolved with weight loss." (Tr. 336-339). In November 2014, she noted that he did not routinely check his blood sugars and did not exercise regularly due to knee pain and "not motivated." He did not watch his diet closely and ate out a lot. (Tr. 340). His A1C was high at 8.9. (Tr. 348).

Dr. Raymond Leung performed a consultative physical exam in December 2014. Plaintiff's chief complaints were high blood pressure, diabetes, carpal

exertional level. He also identified jobs that plaintiff could do at the sedentary level. (Tr. 81-85).

### 3. Medical Records

A sleep study was done in April 2014 because of excessive daytime sleepiness and snoring. His medical history included overweight, obstructive sleep apnea, diabetes, and hypertension. He had been using a CPAP machine. He was switched to a BiPAP machine. (Tr. 253-255).

Plaintiff received primary health care from APRN Kimberly Bellangee. She saw him in July 2014 to follow up on the sleep study. He reported that he was "doing great" and had more energy in the mornings. He had no concerns. (Tr. 333). In September 2014, his back pain was much better with a home exercise regimen. On exam, he had no back deformity or tenderness, and normal range of motion of all joints. He was "still struggling" with the diet and said that portion control was difficult. He weighed 306 pounds. His blood sugars were uncontrolled, and she indicated that if he did not watch his diet better, he would need to be on insulin. APRN Bellangee stressed that "most of his chronic conditions would be resolved with weight loss." (Tr. 336-339). In November 2014, she noted that he did not routinely check his blood sugars and did not exercise regularly due to knee pain and "not motivated." He did not watch his diet closely and ate out a lot. (Tr. 340). His A1C was high at 8.9. (Tr. 348).

Dr. Raymond Leung performed a consultative physical exam in December 2014. Plaintiff's chief complaints were high blood pressure, diabetes, carpal

tunnel syndrome, degenerative disc disease in his mid and low back, and sleep apnea. He said he did not wear braces for his carpal tunnel syndrome and he had numbness, tingling, and pain in his hands. On exam, plaintiff weighed 320 pounds. He was able to walk 50 feet unassisted and could tandem walk, toe walk, heel walk, and squat. He could oppose the thumb to each finger in both hands. Pinch strength, arm, leg, and grip strength were 4+/5 throughout. He had decreased sensation to light touch and pinprick in the left hand. He had moderate difficulties in performing some maneuvers with his hands, including picking up a coin and a pen, buttoning and unbuttoning, and picking up and holding a cup. (Tr. 350-357).

APRN Bellangee saw plaintiff to follow up for diabetes and blood pressure in February 2015. (Tr. 367-372). The next record from her office is dated March 8, 2016. She saw him on that date to recheck on his chronic conditions of diabetes and high blood pressure. His list of "current outpatient prescriptions" included "Elastic Bandages & Supports (NEXCARE CARPAL TUNNEL BRACE)" with the description "Bilat. Braces for carpal tunnel." (Tr. 373-376). In May 2016, plaintiff told APRN Bellangee that he was continuing to wear wrist braces at night but he was now having symptoms over the braces. He had numbness and tingling in both hands and was waking up at night with hand pain. She said she would refer him to an orthopedic specialist. He also complained of not sleeping well with his CPAP. She said she would look into having it titrated. (Tr. 378-381).

On APRN Bellangee's referral, plaintiff was seen at Orthopedic Center of

Southern Illinois on June 2, 2016. He said he had pain, numbness, and tingling in the radial 4 digits of both hands. He had been wearing braces at night for the last year, but he woke up at night with symptoms. An EMG showed significant motor and sensory nerve conduction slowing. The assessment was severe bilateral carpal tunnel syndrome. Dr. Joon Ahn performed a right carpal tunnel release in October 2016. One week later, plaintiff had no tingling, numbness, or pain. Finger range of motion was full. He could resume light activity. One month later, the sensation in his right fingers was much better and he denied night symptoms in the right hand. He was ready to schedule surgery on the left arm. The left carpal tunnel release was performed on December 8, 2016. One week later, plaintiff had no tingling, numbness, or pain in the left hand. Finger range of motion was full. He could resume light activity. Dr. Ahn was to see him in 4 weeks and hoped to be able to release him to resume full activity as tolerated. (Tr. 403-425).

Plaintiff's BiPAP machine was titrated during a sleep study on August 24, 2016. Titration of the BiPAP eliminated most of the apneas, hypopneas, desaturation, and snoring. (Tr. 432-453).

## Analysis

Plaintiff first argues that the ALJ erred in finding that he could frequently use his bilateral upper extremities for feeling, handling, fingering, pushing, pulling, and operating hand controls.

Upon questioning by the ALJ, the VE testified that a person with plaintiff's RFC but who was limited to occasional, rather than frequent, use of the right upper

extremity for feeling, handling, fine fingering, pushing, pulling, and operating hand controls would not be able to do any work at the light or sedentary exertional level. (Tr. 81-85).

The agency defines occasional as "occurring from very little up to one-third of the time." Frequent is defined as "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, *5-6.

Plaintiff argues, correctly, that the ALJ misstated the medical evidence and overlooked pertinent medical evidence in assessing the effects of his carpal tunnel syndrome. First, the ALJ was under the impression that plaintiff had "only recently had treatment for his carpal tunnel syndrome." (Tr. 31). He completely ignored the fact that, per APRN Bellangee's recommendation, plaintiff wore wrist splints at night for a year before he was referred to an orthopedic specialist for surgical treatment of his carpal tunnel syndrome. Further, the ALJ minimized the EMG findings; the EMG found severe carpal tunnel syndrome, but the ALJ only remarked that it showed "bilateral carpal tunnel syndrome and minimal left ulnar neuropathy." (Tr. 30).

The ALJ also minimized Dr. Leung's findings on the consultative exam. The ALJ acknowledged only that Dr. Leung found that plaintiff had "some difficulty picking up a penny from the table and that he had positive Phalen's and Tinel's signs." (Tr. 31). In fact, Dr. Leung observed that plaintiff had moderate difficulties performing a number of maneuvers with his hands and fingers, as well as reduced grip and pinch strength.

Dr. Leung was acting as a state agency consultant when he examined plaintiff. As such, he is unlikely to exaggerate his disability. *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). His report establishes that, at least in the period of time prior to his surgery, plaintiff had moderate difficulty performing simple maneuvers such as picking up a coin and buttoning/unbuttoning. The ALJ did not offer any reason to doubt the correctness of the observations. He failed to grapple with the substance of the report. That was error. While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases.

Plaintiff applied for benefits in September 2014, and his carpal tunnel surgeries did not take place until late 2016. It is difficult to discern what evidence supports the ALJ's determination that he could frequently use his hands for fine and gross manipulations during that period. The opinions of the state agency reviewers do not provide substantial support for that conclusion because they did not know about the treatment rendered by APRN Bellangee, the EMG results, or the surgeries. See, *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018).

The evidence from the VE indicates that there are no jobs for plaintiff at the light or sedentary level if he cannot use his hands frequently for gross and fine manipulations. There is scant evidence in the record to support a finding about plaintiff's ability to use his hands after his recovery from his carpal tunnel

surgeries.  The last note from Dr. Ahn obviously contemplates that plaintiff would return for further evaluation.  Plaintiff argues that the ALJ's failure to obtain all of Dr. Ahn's records (and some missing records from APRN Bellangee) was also error. The Court agrees.  An ALJ has an independent duty to develop the record fully and fairly.  20 C.F.R. § 416.912(b).  While that duty is enhanced where plaintiff was pro se at the agency level, it is not eliminated where a claimant had counsel.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009)("This duty is enhanced when a claimant appears without counsel....").

Here, it was obvious that the orthopedic surgeon's records were incomplete. Plaintiff testified that he had seen the surgeon for follow-up in January 2017.  (Tr. 62).  There was no medical evidence in the record regarding plaintiff's ability to use his hands after his recovery from both surgeries.  In the circumstances of this case, it was error for the ALJ to deny plaintiff's application without reviewing all of Dr. Ahn's records.

In view of these errors, it is not necessary to analyze plaintiff's other points.

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions."  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted.  The Court must conclude that ALJ Yoder failed to build the requisite logical bridge here.  Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent

meaningful review." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  September 26, 2018.**

            **s/ Clifford J. Proud**
            **CLIFFORD J. PROUD**
            **UNITED STATES MAGISTRATE JUDGE**